IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| RODNEY C. OFFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 14-1060-CV-W-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Rodney Offield seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in failing to rule on objections to the reliability of the vocational expert's testimony and improperly assessed plaintiff's residual functional capacity with regard to a sit-stand option. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On April 4, 2012, plaintiff applied for disability benefits alleging that he had been disabled since February 1, 2010. Plaintiff alleges that his disability stems from a bruised spine, pinched nerves, numb right arm and hand, trouble sleeping, chronic back and leg pain, and three crushed vertebrae (Tr. at 149). Plaintiff's application was denied on July 23, 2012. On May 22, 2013, a hearing was held before an Administrative Law Judge. On August 16, 2013, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On August 6, 2014, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Amy Salva, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1977 through 2013:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1977 | $   535.90 | 1996 | $ 9,983.68 |
| 1978 | 636.01 | 1997 | 7,322.00 |
| 1979 | 176.70 | 1998 | 10,113.25 |
| 1980 | 1,662.56 | 1999 | 4,159.25 |
| 1981 | 352.83 | 2000 | 8,961.25 |
| 1982 | 50.88 | 2001 | 11,630.53 |
| 1983 | 0.00 | 2002 | 606.48 |
| 1984 | 0.00 | 2003 | 0.00 |
| 1985 | 0.00 | 2004 | 1,420.25 |
| 1986 | 149.95 | 2005 | 15,406.51 |
| 1987 | 1,790.00 | 2006 | 17,627.11 |
| 1988 | 296.50 | 2007 | 16,821.72 |
| 1989 | 1,423.35 | 2008 | 16,888.00 |
| 1990 | 2,592.93 | 2009 | 17,047.26 |
| 1991 | 3,906.80 | 2010 | 1,298.38 |
| 1992 | 7,556.35 | 2011 | 0.00 |

4

| 1993 | 6,262.73 | 2012 | 0.00 |
| 1994 | 10,249.58 | 2013 | 0.00 |
| 1995 | 8,855.13 | | |

(Tr. at 139-144).

**Function Report**

In a Function Report dated June 11, 2012, plaintiff described his day as follows: "Get up take shower, do some chores, whatever needs done that I can do, watch a little TV before bed." (Tr. at 159-166). He sleeps about an hour at a time. When asked to explain how his condition affects his personal care, he stated that he is "slower than usual" at dressing, bathing, and using the toilet. He prepares his own meals at least once a day. He does his own laundry. He helps "pick up yard and whatever else." He is outside almost all day every day. When he goes out, he walks or rides in a car. He shops for groceries in stores about once a month. Plaintiff fishes for catfish. He used to fish for bass but that is harder to do now.

Plaintiff's condition makes him slower at lifting, squatting, bending, standing, reaching, walking, kneeling, climbing stairs and using his hands. He has no problem with sitting, remembering, completing tasks, concentrating, understanding, following instructions or getting along with others. He can walk one block before needing to rest for a couple minutes. He can pay attention as long as necessary. Plaintiff's hands tingle all the time and his right side is always "sore to the touch."

**B.    SUMMARY OF MEDICAL RECORDS**

On October 10, 2009, plaintiff was seen at Liberty Hospital with an admitting diagnosis of alcohol use and possible stroke (Tr. at 203-263). "He drank a 12 pack of beer on the Friday before his admission. He became intoxicated and passed out. At some point during the evening, he fell sustaining abrasions on his face. His friends apparently picked him up and

5

carried him inside and laid him on a mat on the floor, passed out. He awoke Saturday morning very unstable on his feet with weakness in his upper extremities, left greater than right. He has today continued weakness, although somewhat improved. He notes he has a pins and needles type pain sensation in his upper extremities." (Tr. at 204, 242).

Plaintiff had gone to Harrison County Hospital but was transferred to Liberty Hospital with complaints of bilateral arm pain, bilateral leg pain, unsteady gait, and decreased ability to grip with his left hand (Tr. at 229). His blood pressure had been 154/89 at Harrison County Hospital (Tr. at 241) and was 107/103 in the emergency room at Liberty Hospital (Tr. at 229), and later 158/103 (Tr. at 243). He weighed 150 pounds (Tr. at 229). Plaintiff reported that he uses marijuana, he uses alcohol, and he smokes (Tr. at 220, 231, 246, 250). He reported smoking a pack of cigarettes a day and was "not motivated to quit" (Tr. at 231, 242). He would typically drink a six-pack of beer daily but reported no problems related to alcohol use (Tr. at 231, 242, 250). He reported using marijuana daily and was "not motivated to quit" (Tr. at 231-232, 242). His urine drug screen tested positive for marijuana (Tr. at 244).

During his initial examination, it was noted that he had normal range of motion in his back and extremities with no tenderness (Tr. at 220). He had full range of motion in his neck with no tenderness (Tr. at 243). Upper extremity strength was 4/5 bilaterally (Tr. at 244). Lower extremity strength was normal, and plaintiff did not have the pins and needles feeling in his legs or feet (Tr. at 244). Plaintiff was admitted with an initial diagnosis of:

1.      Bilateral upper extremity weakness and pain, left greater than right, suspicious for brachial plexus injury or i.e. "Saturday night palsy."[1]

2.      Facial abrasions.

---

[1]The term Saturday night palsy has become synonymous with radial nerve compression in the arm resulting from direct pressure against a firm object. It typically follows deep sleep on the arm, often after alcohol intoxication.

3.      Alcohol abuse.

4.      Mildly elevated blood pressure, quite possibly related to withdrawal symptoms. (Tr. at 244-245).

An MRI of plaintiff's cervical spine showed probable moderate cord contusion (bruise) at the C3-C4 level with a prominent anterior disk osteophyte complex[2] at this level with moderate spinal stenosis (potential compression of the spinal cord) as well as disk space narrowing at C3-C4.  Small central bulging disk[3] at C6-C7 without spinal stenosis (Tr. at 204, 257).  CT of cervical spine showed degenerative disk space changes at C3-C4.  No fracture or subluxation.[4]  Vertebral bodies were maintained in height, and alignment was normal (Tr. at 204, 226, 255).

CT of the lumbar spine showed L4-L5 and L5-S1 disk space changes.  No fracture or subluxation.  Vertebral bodies were maintained in height, and alignment was normal (Tr. at 204, 226, 256).  Hip x-rays were normal (Tr. at 227, 253).  An MRI of the brain was normal (Tr. at 248, 259-260).

---

[2]Disc osteophyte complex occurs when more than one spinal vertebra or intervertebral disc is affected by osteophytes, which are more commonly referred to as bone spurs.  When your spine begins to weaken, either due to aging, degenerative diseases, obesity, improper use or overexertion, your body tries to produce extra nodules of bone (this is the osteoblastic, or "bone growth," process), both to reinforce the structural integrity of the spine and to limit the spine's mobility.

[3]Disks act as cushions between the vertebrae in your spine. T hey are composed of an outer layer of tough cartilage that surrounds softer cartilage in the center.  It may help to think of them as miniature jelly doughnuts, exactly the right size to fit between your vertebrae.  A bulging disk extends outside the space it should normally occupy.  The bulge typically affects a large portion of the disk, so it may look a little like a hamburger that is too big for its bun.  The part of the disk that is bulging is typically the tough outer layer of cartilage.  Bulging usually is considered part of the normal aging process of the disk.

[4]Spinal vertebra that is out of position in comparison to the other vertebrae.

Plaintiff was placed on cervical spine immobilization.  By October 12, 2009 -- two days after he was admitted -- plaintiff had normal strength in his upper extremities, although reflexes were "depressed" (Tr. at 246, 248).  Clifford Gall, M.D., a neurosurgeon, wrote:

> [S]tatus post fall with weakness and numbness in his arms.  Thankfully, his legs seem to [be] working relatively well.  This certainly would suggest a so-called central cord syndrome.[5]  His MRI clearly demonstrates a **central cord syndrome**, I believe, with narrowing of the spinal canal from arthritic changes at C3-C4 and C4-C5 and an abnormal signal within the spinal cord there.
>
> In terms of what to do about this, most of these patients indeed will improve on their own and indeed so far this patient says he is already somewhat better.  Indeed, has relatively good function in the upper extremities at this time.  Thus, we will complete the so-called steroid spinal cord injury's protocol.  I will encourage him to wear a cervical collar.  We will support him and get him through this and see how much improvement he will make with time.  It is possible that he will require rehabilitation consultation but for the moment we will simply see how he does.
>
> Other issues for him, of course, would be dealing with his alcohol and marijuana abuse.  Clearly easier said than done I am sure.



(Tr. at 248-249).

On October 14, 2009 -- four days after his admission -- plaintiff was seen by Salvatore Miceli, D.O. (Tr. at 250-252).  Plaintiff continued to have some paresthesias (abnormal "pins

---

[5]Central cord syndrome (CCS) is an incomplete traumatic injury to the cervical spine resulting in more extensive motor weakness in the upper extremities than the lower extremities.  The mechanism of injury occurs from a forceful hyperextension neck injury with prior existence of degenerative ligamentous and osteophytic spinal column disease.  There is usually no obvious associated spinal column fracture or evidence of spinal instability.  CCS occurs typically in patients with hyperextension injuries where the spinal cord is squeezed or pinched between pre-existing anterior cervical spondylotic bone spurs and thickened posterior intraspinal canal ligament, the ligamentum flavum -- a strong ligament that connects the laminae of the vertebrae.

8

and needles" feeling) in his arms, a little worse on his left side. He reported still having some weakness in his hands, especially on the left. He continued to have some problems with balance. Plaintiff had 4+/5 strength in his upper extremities (Tr. at 251). His left hand showed some slowing with grasp and release and "some impaired fine motor movements" (Tr. at 251). Right hand had nearly normal speed and fine motor movements (Tr. at 251). His legs were normal (Tr. at 251). "I observed him ambulating and transferring. He transferred from supine to sitting position independently. He stood independently. Using a roller walker, he ambulated in the halls and back to his room. No loss of balance was noted. He did have a somewhat slow gait but appeared steady." (Tr. at 251). Dr. Miceli recommended a couple more days of physical and occupational therapy in the hospital after which "I suspect he should be able to manage at home. . . . He does need a roller walker for home use. He will likely be off work for several weeks while his issues improve. I explained that his weakness will likely persist for a few weeks but I am hopeful he will have a near full return of function. I explained it may take up to a year to improve as much as possible." (Tr. at 252).

Plaintiff worked with physical therapy during his eight-day hospital stay. He was treated with Metoprolol for elevated blood pressure. He was given Neurontin (treats nerve pain) for pain. Plaintiff was discharged on October 18, 2009, with the following discharge diagnoses: central cord syndrome, facial abrasions, alcohol abuse, and hypertension (Tr. at 204). He was given prescriptions for Metoprolol, Neurontin, and Percocet (narcotic) as needed for pain (Tr. at 205). Plaintiff was to follow up with Dr. Gall in neurosurgery and Dr. Miceli for rehab (Tr. at 204, 205). He was discharged without any physical restrictions (Tr. at 205).

On November 16, 2009, plaintiff was seen at North Missouri Family Health Center by Jayne Doolittle, a nurse practitioner, to establish care and to follow up after his hospitalization

9

(Tr. at 268). "He was left with some residual numbness, tingling, arm aching and a little bit of arm weakness. His gait is immensely improved. . . . Thinks overall he is doing better. He had been scheduled for physical therapy but did not go. He continues to have numbness in his fingertips." Plaintiff was walking without difficulty and was no longer using a walker. He said he was hoping to get back to work -- he discussed a light duty job at his place of employment where he would have to lift at the most 15 pounds and he believed he could do that. He had been doing exercises with bands at home. Plaintiff stated that he was not using alcohol but continued to smoke a pack of cigarettes per day as he had for the past 30 years. He weighed 150 pounds. His blood pressure was 110/76. On exam plaintiff had "a little bit of tenderness at the very base of the cervical spine into the thoracic upper spine but no other abnormality". He had full range of motion in his shoulders, neck, arms, and fingers. Plaintiff was able to distinguish correctly where he was being touched on all of his fingers but the feeling was somewhat diminished. His gait was steady. He had strong flexion, extension, internal and external rotation of his legs. "I did get him an appointment with Dr. Danushkodi. I went ahead and refilled Neurontin. . . . Cautioned that is not a medication to come off of quickly." Plaintiff requested a refill of Percocet, indicating that he takes one a day or sometimes less than that. Plaintiff was given a prescription for Percocet, 30 tablets with no refills. He was released to return to work on light duty. "He can lift the compressors, 15 pounds, to bring them up to the table to work on but no other lifting than that. We will await Dr. Danushkodi's evaluation and treatment plan." There are no medical records showing plaintiff saw Dr. Danushkodi.

Eleven months later, on October 6, 2010, plaintiff was seen at North Missouri Family Health Center for a "DFS physical" (Tr. at 267, 287). "Patient states he is applying for disability as he has had an intermittent leg and arm pain with paresthesias but no loss of strength from a spinal cord bruise that occurred approximately a year ago." Plaintiff had not

10

been seen in this office since November 16, 2009. He was no longer taking Neurontin, blood pressure medicine or any pain medicine. "I discussed with him taking the Neurontin however since he takes it so intermittently, abrupt discontinuation can increase the seizure threshold. I do not believe it is wise for this gentleman to restart this at this time." Plaintiff was counseled on the necessity of taking his blood pressure medication. "He has no other specific complaint today other than he has generalized pain in his elbows and arms and his legs when he walks or lifts. He states it is pretty general. It is not generally his back but his arms and legs. It sometimes goes from his back, down the back of his leg. He denies weakness but says it is limited secondary to pain. He occasionally has the feeling of his limbs falling asleep but that is also intermittent. He cannot give me exact course regarding the number of times per day or week or month this happens." Plaintiff's blood pressure was 148/86. On exam plaintiff had normal strength in his arms and legs. He was able to walk without difficulty. "I do suspect that patient should follow-up with neurology. A repeat MRI may be of some benefit but I believe neurologic exam by a neurologist is warranted." Plaintiff's blood pressure medication was refilled and blood work was ordered. There is no evidence that plaintiff ever had the blood work done.

A year and seven months later, on May 11, 2012, plaintiff was seen at the Harrison County Community Hospital emergency room (Tr. at 273-278). "This 49-year-old male was in his usual state of health when he had his right middle finger closed in a truck tailgate; he was helping some friends and had been drinking. . . . He is a patient of Dr. Dean but apparently has not been seen by Dr. Dean in some time." The triage nurse noted that plaintiff smelled very strongly of alcohol and was accompanied by two friends who also smelled of alcohol. His speech was slurred and his coordination was poor. He was observed to be staggering. Plaintiff admitted having high blood pressure but had not been taking his

11

medication. At this time, plaintiff was taking no medication of any kind. "He is a pack a day cigarette smoker. He is a regular user of alcohol including tonight." X-rays showed a fracture of his right middle finger. He was assessed with open fracture and crush injury to the right middle finger and acute alcohol intoxication. Although plaintiff had reported drinking three beers, his blood alcohol level was .264. His fingertip was sutured and he was told to return in 48 hours for dressing change and reevaluation.

On May 15, 2012, plaintiff was seen at Harrison County Community Hospital by Corey Trease, M.D. (Tr. at 279-280). Dr. Trease recommended surgical repair plaintiff's finger under local anesthetic. On May 17, 2012, plaintiff had surgery on his finger to repair the nail bed injury (Tr. at 289-293). He reported that he smokes 1 1/2 packs of cigarettes per day and drinks a six-pack of beer daily. A pin was used to repair the finger fracture.

On July 5, 2012, plaintiff saw David Cathcart, D.O., for a disability evaluation (Tr. at 282-284). Plaintiff's chief complaint was back and leg pain.

> He stated he lost his job because he was working too slowly. He feels like his problems started due to an injury about two years ago where he fell out of a truck and hit his head and states that he bruised his spinal cord in the cervical spine at that time. There were no fractures. He did not require any surgery. He said initially he had a great deal of difficulty walking. He was in the hospital for several days and was referred to outpatient physical therapy but he said he thought he would just do it on his own. He said initially he had to use a walker but gradually was able to get to the point where he could walk on his own but he still has trouble walking. He says his hands are constantly numb. He says that he typically has to think harder about his activities, that is, more effort to make his hands and legs do what he intends for them to do. He says his feet feel constantly numb and he feels generally weak. His barriers to return to the competitive labor market are trouble with prolonged standing; he says he cannot stand for more than 30 minutes at a time and he has trouble with lifting because of weakness in the hands and trouble with his balance.

Plaintiff continued to smoke a pack of cigarettes a day and he reported drinking a six-pack of beer daily. Dr. Cathcart reviewed an MRI of plaintiff's cervical spine dated October 10, 2009. On exam plaintiff weighed 145 pounds. His blood pressure was 178/98. He described his pain as a 6 out of 10. Dr. Cathcart noted that plaintiff had a normal, fluid gait.

Tandem walking was intact. Plaintiff was able to walk on toes and heels without difficulty, perform a full squat, arise from a squat, and get on and off the exam table without difficulty. He had full and unguarded range of motion in his cervical and dorsolumbar spine with no evidence of paraspinal muscle spasm. Straight leg raising was negative. Patrick test[6] was negative. He had full and unguarded range of motion in his shoulders, elbows, wrists, hips, knees and ankles. Range of motion in all joints of the hands and fingers was normal. No significant degenerative findings were evident. Plaintiff had normal strength in his arms and legs. Grip was normal in both hands and he was able to make a fist with both hands. Manual dexterity was normal. All sensory functions were intact. "There was also four beat clonus[7] noted more on the left than the right consistent with a cervical myelopathy."[8]

Dr. Cathcart assessed cervical myelopathy and hypertension. He found that plaintiff can sit for six hours per day, stand and walk up to four hours per day, lift 20 to 30 pounds occasionally and 15 to 20 pounds frequently. He should be restricted from climbing ladders and balancing at unprotected heights. He can occasionally bend, stoop, kneel, crouch or

---

[6]This test assessed whether the sacroiliac joint or hip joint is the source of a patient's pain.

[7]A jerk-like rapid foot beating triggered by turning the ankle upward.

[8]The cervical spine (neck) is made up of a series of connected bones called vertebrae. The bones protect the spinal canal that runs through the vertebrae and carries the spinal cord. The spinal cord contains nerves that give strength and sensation to the arms and legs, and provide bowel and bladder control. Numerous connections (discs, joints, ligaments and muscles) between the cervical vertebrae provide support, stability and allow motion. With age, intervertebral discs become less spongy and lose water content. This can lead to reduced disc height and bulging of the hardened disc into the spinal canal. The bones and ligaments of the spinal joints thicken and enlarge, also pushing into the spinal canal. These changes are common after age 50 and are generally called "cervical spondylosis" or "cervical stenosis." Cervical stenosis may occur at a very slow or very fast rate. These changes cause narrowing of the spinal canal and can pinch the spinal cord and nerve roots. Spinal cord or nerve function may be affected, causing symptoms of cervical radiculopathy or myelopathy. Cervical stenosis is the name for the actual narrowing of the canal, while cervical myelopathy indicates injury to the spinal cord and its function.

crawl. "No restrictions regarding use of his hands. However, he should be restricted from working over head." He should be restricted from working around machinery with moving parts. "This examinee has had a cervical injury that has left him with some mild but definite cervical myelopathy, evidenced by some lack of coordination, slowness of movement and hyperreflexia. He could work in a light labor position, assembly type work that did not require him working around dangerous machinery such as moving parts. In my opinion, it is going to be difficult for him to return back to the competitive labor market on the basis of his current condition."

C.      SUMMARY OF TESTIMONY

During the May 22, 2013, hearing, plaintiff testified; and Amy Salva, a vocational expert, testified at the request of the ALJ.

1.      Plaintiff's testimony.

Plaintiff was 50 years of age at the time of the hearing and is currently 52 (Tr. at 32). Plaintiff is divorced and has three children -- one recently graduated, one is 15 and one is 13 (Tr. at 32). Plaintiff lives in a house with his sister and four of her children (the oldest of the children is 12) (Tr. at 33). Plaintiff has a tenth grade education and does not have a GED (Tr. at 33).

In November 2009 plaintiff fell out of the back of a truck and bruised his spine (Tr. at 34). In 2009 plaintiff was working for Accurate Biomed rebuilding oxygen compressors (Tr. at 34-35). The main thing that keeps plaintiff from working is that he is "too slow" with anything physical (Tr. at 38). His hands and arms are always numb, he cannot lift much because of his back, and his neck hurts a lot (Tr. at 38).

At the time of the hearing plaintiff was taking no medication (Tr. at 36-37). He had not taken any medication for a couple of years because he has not had insurance (Tr. at 37).

14

Previously plaintiff took Neurontin and Oxycodone along with hypertension medication (Tr. at 37). For pain relief plaintiff takes Ibuprofen which helps some but it seems like he is always in pain (Tr. at 38).

Plaintiff's driver's license expired about ten years ago (Tr. at 34). He does not drive (Tr. at 33). He is able to do his own laundry, he cooks, and he can do dishes sometimes (Tr. at 39).

## 2. Vocational expert testimony.

Vocational expert Amy Salva testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could sit for four hours per day and stand and walk in combination for four hours per day. The person would need a sit-stand option. He could lift, carry, push or pull up to 10 pounds frequently and up to 20 pounds occasionally; however, none of those activities could be performed above shoulder level. The person should never climb ladders, ropes or scaffolding. He could occasionally climb stairs or ramps and stoop. He should never kneel, crouch or crawl and should avoid extreme cold, vibration, and hazards such as dangerous machinery or unprotected heights. The person could never reach above shoulder level with either arm (Tr. at 43). The vocational expert testified that such a person could not perform any of plaintiff's past relevant work (Tr. at 43) but could perform some light or sedentary unskilled jobs (Tr. at 44). Examples of light exertional level work that the hypothetical person could perform are retail marker, DOT 209.587-034, with approximately 2,500 jobs in Missouri and approximately 130,000 in the country; inserting machine operator, DOT 208.685-018, with approximately 4,000 in Missouri and approximately 75,000 in the country; or small parts assembler, DOT 706.684-022, with approximately 2,000 positions in Missouri and approximately 75,000 in the country (Tr. at 44). All three of these positions require frequent reaching; however, the vocational expert testified that "it's my experience that they don't reach overhead in those positions. . . I reduced

15

those numbers based on partly that and partly the option to sit or stand. . . . I reduced the total number of jobs by 50 percent." (Tr. at 46-47).

The second hypothetical was the same as the first except that the person would miss two to three days of work per month due to symptoms (Tr. at 44). Such a person could not work (Tr. at 44).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Christine Cooke entered her opinion on August 16, 2013 (Tr. at 10-21). Plaintiff's last insured date was March 31, 2015 (Tr. at 10, 12).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 12).

Step two. Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine and cervical spine (Tr. at 12).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13).

Step four. Plaintiff retains the residual functional capacity to perform light work. He can lift, carry, push or pull up to 10 pounds frequently and up to 20 pounds occasionally, except not above shoulder level. He is able to sit for 4 hours per workday and stand or walk for 4 hours per workday, and requires a sit/stand option. (Tr. at 13). He should never climb ladders, ropes or scaffolding; kneel; crouch or crawl. He can never reach above shoulder level with either arm. He can occasionally climb stairs or ramps and stoop. He must avoid extreme cold and vibration and must never be exposed to hazards such as dangerous machinery and unprotected heights (Tr. at 13). With this residual functional capacity, plaintiff is unable to perform any of his past relevant work (maintenance mechanic, forklift operator, and smoked meat preparer) (Tr. at 16).

16

Step five.  Plaintiff was 46 years of age on his alleged onset date, which is a younger individual (Tr. at 16).  He subsequently changed age category to "closely approaching advanced age" (Tr. at 16).  Considering plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform, such as retail marker, inserting machine operator, and small parts assembler (Tr. at 17).  Therefore, plaintiff is not disabled (Tr. at 17).

## VI.    OBJECTION TO VOCATIONAL EXPERT TESTIMONY

Plaintiff argues that the ALJ erred in failing to rule on plaintiff's objection to the vocational expert's testimony regarding her sources and methodology for determining job incidence data.  HALLEX § I-2-5-55, cited by plaintiff in support of his assertion that "[t]he ALJ was obligated by unambiguous Agency policy to rule on these objections," states as follows:

> During the opening statement, the ALJ must explain why VE testimony is necessary.  The VE may attend the entire hearing, but this is not required.
>
> Before the VE testifies, the ALJ must:
>
> - ensure on the record that the VE has examined all vocational evidence of record;
>
> - ensure that the record contains an accurate statement of the VE's professional qualifications;
>
> - give the claimant and the representative an opportunity to ask the VE questions about his or her professional qualifications; and
>
> - summarize the opening statement or relevant testimony on the record (e.g., testimony regarding the claimant's vocational history) if the VE was not present.
>
> NOTE: All VE testimony must be on the record.
>
> The ALJ should take care to elicit useful and objective testimony from the VE.  For examples of the types of questions the ALJ might ask, see I-2-5-94, Sample-Interrogatories to Vocational Expert.
>
> If the VE's reply to an ALJ's question is ambiguous or overly technical, the ALJ must follow-up with more specific questions.  An ALJ must not question a VE about any matter which is not within the VE's area of expertise and responsibility.  For example, the ALJ must not ask a VE about medical matters, how the ALJ should decide the case or

17

whether the number of jobs identified by the VE in the regional and national economies [is] "significant." *However, the ALJ can ask the VE to provide the number of specific jobs identified in the regional and national economies.*

If certain VE testimony is based on an assumption, the VE or ALJ must clearly describe the assumption on the record.

*If a claimant raises an objection about a VE's opinion, the ALJ must rule on the objection and discuss any ruling in the decision.*

The ALJ must also determine if there are any conflicts between the jobs identified by the VE and how the jobs are described in the Dictionary of Occupational Titles and how the jobs are performed in today's workplace. If there are conflict(s), the ALJ must ask the VE to identify the conflict(s) and inquire how the VE resolved the conflict(s) and whether the conflict(s) impact the number of jobs testified to by the VE. If the number of jobs testified to by the VE as being available [is] impacted, the ALJ must obtain from the VE the basis of any adjustments and how the adjustments were derived. See SSR 00-4p.

1994 WL 637383 (emphasis added).

On May 15, 2013, prior to the administrative hearing, plaintiff's counsel sent a letter to

the ALJ:

> . . . At this time, I am writing to request that you require the vocational witness to bring to the hearing certain documents upon which they may rely in forming opinions during the course of the hearing. I believe availability of the requested documents is reasonably necessary for full presentation of the case. (See 20 CFR § 404.950(d)(1)). It is particularly important to the claimant at step-five of the sequential evaluation process, as the burden of proof is on the Commissioner to demonstrate the existence of significant numbers of other jobs.

> It has been my experience that vocational experts often testify as to numbers of jobs that exist in various labor markets, nationally, regionally, and locally, and for a variety of occupations; however, there is frequently a failure to identify the statistical source(s) for said opinions. Vocational witnesses, when questioned cite various sources of statistical information including but not limited to, census data, Department of Labor data, and computer programs such as Skill TRAN, etc. However, unless the vocational witness brings the documentation upon which he/she relies in forming opinions regarding the numbers of jobs available in various labor markets, it is not possible to adequately cross examine the vocational witness. As an alternative, and in further effort to expedite the taking of testimony, I would respectfully request that the Vocational Witness provide my office the source of their statistical information in writing prior to the hearing. This way, I can independently obtain the sources that will be relied upon by the Vocational Witness, thus allowing for a more focused and expedient examination of this witness at the upcoming hearing.

18

Further, vocational witnesses often purport to have experience in conducting labor market surveys. Accordingly, I am also asking that the vocational witness bring copies of all labor market surveys that they have either performed and/or upon which they will be relying when forming opinions as to the number of jobs that may exist for specific occupations in the labor market. I would also ask that the vocational witness supplement their curriculum vitae, so as to include what, if any, experience he/she has in conducting labor market surveys and analysis and gathering and analyzing data relative to the number of jobs that exist in a local, regional or national economy.

Lastly, I am requesting that the vocational witness bring to the hearing copies of any and all sources, including but not limited to, websites, computer programs, journals, books, articles, or other such publications that explain, discuss, or describe how the availability of various jobs/occupations [is] affected by certain limitations, which are generally outlined in Social Security Ruling 96-9p, and can be reasonably expected to be used as part of hypothetical questions posed to the vocational witness.

<u>Finally, I object to the vocational witness testifying regarding the number of jobs that exist nationally, regionally, or locally, unless the vocational witness can produce valid, reliable, and reproducible data to support their opinions, conclusions, and testimony. I do not believe that the vocational witness scheduled to testify has any qualifications as a labor market surveyor or statistician that would qualify them to make extrapolations from the various data sources I have described, and expect the vocational witness to use at [the] hearing. Accordingly, I object to the witness's competency to offer such opinions.</u>

I would respectfully request that a subpoena be issued requesting the vocational witness to bring the above referenced items to hearing. . . .

(Tr. at 195-196) (emphasis in the original).

At the beginning of the administrative hearing, the ALJ addressed this letter:

ALJ: Now as a matter of procedure, Mr. Clark, I note that I have a letter located at 12F, it is 2 pages. In essence it appears that it is a written objection to the vocational expert's testimony. Can you tell me on what basis you object to that testimony?

ATTY: Well, I think part of this will play out based on the testimony. But I believe the objection is couched in terms that there's, unless there's a valid and reliable reproducible scientific method behind the job numbers that are going to be testified to that that testimony is not in the nature of expert witness testimony and shouldn't be admitted. I believe that's the summation of that argument.

ALJ: So in essence then am I to [conclude] that this is an [assertion] that the Federal Rules of Evidence, 701 through 705, apply to a Social Security proceeding?

ATTY: No, and I think there's plenty of case law to suggest that it doesn't. But there's also case law to the affect that such evidence has to have some scientific basis. It just can't be -- I think the terms in the case law is 'made up out of [whole] cloth.' That

19

there has to be some sort of validity to expert testimony. . . . I don't believe it's from the 8th Circuit, for what it's worth, but I can submit the citation. I just don't know it off the top of my head. And I think part of, part of the objection is going to depend on the actual method behind how the job numbers are produced so I mean part of the objection is based, it's going to be based on what the actual testimony is I think, so.

ALJ: Well, I also know that that letter requested that I issue a subpoena for documents from Ms. Salva. I have not done that and I will not issue a subpoena to my own witness. We can just see how that plays out. I'm sure she'd be more than happy to provide me with anything that I may request. And we'll just wait and see how her testimony plays out.

ATTY: Thank you, Judge.

ALJ: So I will simply reserve my ruling on that objection.

(Tr. at 30-32).

When vocational expert Amy Salva took the stand, the following occurred:

ALJ: Do you have voir dire for the VE, Mr. Clark?

ATTY: Not at this time.

ALJ: Well, now would be the time to do it.

ATTY: Okay. Well, then I, then I will.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q.    Ma'am, I do have some questions about your experience as far as in your past work of actually working with folks on a vocational basis. Does a vocational specialist when it works with people who are not working does it try to work with them to identify their strengths and place them in jobs where they could succeed?

A.    Right.

Q.    Okay. Is that the main area of your expertise that you've developed your training and education?

A.    Right. I've done vocational testing and counseling, job placement services, labor market surveys. All of those are vocational counseling job duties.

Q.    In performing those tasks did you ever have the chance to count the number of jobs in the national economy?

A.    Not individually.

Q. And as far as counting jobs is that an area that you're an expert in?

A. That's one of the, the aspects of doing a labor market survey, finding out if there are jobs in the area that an individual could do. I have, you know, I use different resources that are all [readily] available such as the Kansas Business Directory, Missouri Business Directory, Missouri Department of Employment, Kansas Department of Employment, U.S. Labor Statistics to determine whether there are jobs out there and then make the calls to the companies to see if they actually have those types of positions. And then go out and look at the jobs to make [sure] that they are how they're described in the <u>Dictionary of Occupational Titles</u> and <u>Selected Characteristics</u> and then determine whether my claimant, client could perform those job duties.

Q. Does those sources of job numbers that you listed does it identify jobs by <u>DOT</u> codes and <u>SOC</u> codes?

A. Yes, they're -- sometimes we use different crosswalks because not all employers will use the same job title for the same type of position. Not all jobs are performed as it's actually, you know, as they're described in the <u>Dictionary of Occupational Titles</u>, so sometimes you have to look at a similar type of job in order to determine whether that's the right job that you're looking at or not.

Q. What process or methodology is used, methodology is used to compare job numbers that are identified differently by different job codes or titles? Is there a process where you can verify that they're the same types of jobs?

A. You have to look at, you either have to talk to someone in Human Resources or you have to go out and look at the job and then, and then you determine what's the best <u>Dictionary of Occupational Titles</u> that you can go by. Vocational counselors are trained through the education system to use the <u>Dictionary of Occupational Titles</u>, <u>Selected Characteristics of Jobs</u> or the O-NET which is not really widely used but we are trained to use those things. We don't use the <u>SOC</u> and the other business classifications as much but we are trained to know, you know, how they come up with those types of codes and --

Q. And you, I just want to make sure I'm tracking everything here, you said you have done labor studies yourself before?

A. I have.

Q. Okay. And are you relying on those studies in part to formulate your testimony today?

A. Yes.

Q. Are you relying on anyone else's studies or published articles?

A.     The U.S. Publishing is the company that looks up statistical information. I don't know what their methodology is for coming up with their numbers but we rely on that for part of the numbers. And part of it is just doing the leg work ourselves.

Q.     Is U.S. Publishing a private company or is it part of the Federal Government?

A.     I, I've always thought it was a private company. I don't really know.

Q.     And do they publish reports with job numbers in specific locations or are they in regional?

A.     They, they, they'll do national and then they do specific regions as well.

Q.     And do you know what the source of their data is?

A.     I don't know.

(Tr. at 35-42).

In response to a hypothetical posed by the ALJ, the vocational expert testified about three jobs with a sit-stand option, of which she said there were about 2,500 in Missouri and 130,000 in the country; about 4,000 in Missouri and 75,000 in the country; and about 2,000 in Missouri and 75,000 in the country (Tr. at 44). The ALJ asked, "and in the formulation of those numbers have you relied upon data generally relied upon by professionals in your field?" The vocational expert answered, "Yes." (Tr. at 44). She also testified that the information about jobs available with a sit-stand option, requirements for reaching overhead, and tolerance for levels of absenteeism came from her experience in placing individuals in different types of positions (Tr. at 44-47). On examination by plaintiff's counsel, the following was said:

Q.     Those job numbers which data source did you use to reach those numbers?

A.     All the ones that I had listed previously in my testimony, the compilation of U.S. Publishing Statistics, Kansas Business Directory, Missouri Business Directory, just basic calling of companies.

(Tr. at 45).

The first question is this:  What objection does plaintiff argue the ALJ should have ruled?  In his letter to the ALJ before the administrative hearing, the only objection is the following:

> Finally, I object to the vocational witness testifying regarding the number of jobs that exist nationally, regionally, or locally, *unless* the vocational witness can produce valid, reliable, and reproducible data to support their opinions, conclusions, and testimony.  I do not believe that the vocational witness scheduled to testify has any qualifications as a labor market surveyor or statistician that would qualify them to make extrapolations from the various data sources I have described, and expect the vocational witness to use at [the] hearing.  Accordingly, I object to the witness's competency to offer such opinions.

(emphasis added).

This objection is clearly based on the vocational expert's ability to "produce" the data on which she relied.  During the administrative hearing, plaintiff's counsel voir dired the witness and thereafter failed to make any objection on the basis of her qualifications.  Indeed at the conclusion of her testimony, which included a detailed list of the data on which she relied in forming her opinion, plaintiff's counsel failed to object to her testimony on any ground.  As a result, there was no objection[9] for the ALJ to rule when the hearing concluded.  Any argument that the original pre-hearing objection was still pending because the vocational expert did not physically produce, while seated in the witness chair, the data on which she relied is meritless -- there is no legal authority for such a proposition.

Plaintiff points to a post-hearing memorandum of law which is dated May 29, 2013, and addressed to the ALJ (Tr. at 197-200).  However, in that memorandum, plaintiff states, "It is my understanding that as a preliminary matter, you overruled this objection."  I will assume that the post-hearing memorandum revived the objection that had already been overruled and

---

[9]Although in his brief plaintiff claims that he "raised objections to the testimony of the vocational expert before, during, and after the hearing," (plaintiff's brief p. 4) the record does not support this.

not made (other than by reference to the pre-hearing letter) during the administrative hearing. In this post-hearing memorandum, plaintiff objected to the vocational expert's testimony because "[n]othing in her training, education, or experience qualifies her to form an opinion regarding the numbers of jobs that exist in the national, regional or local economy" and "[t]here is no way to independently verify the veracity of the numbers that US Publishing program provided." (Tr. at 198).

The burden of proof lies with the Commissioner to show that appropriate work exists in significant numbers either in the region where the claimant lives or in several regions of the country. Bjornholm v. Shalala, 39 F.3d 888, 891 (8th Cir. 1994). It is undisputed that the Federal Rules of Evidence do not apply to Social Security administrative hearings. 42 U.S.C. § 405(b); Richardson v. Perales, 402 U.S. 389, 409-410 (1971); McClees v. Sullivan, 879 F.2d 451, 453 n.2 (8th Cir. 1989). The test for reliability as outlined in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993),[10] and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999),[11] does not apply in Social Security administrative hearings. Jordan v. Astrue, 2009 WL 3380979 (D. Neb., October 21, 2009) (citing Bayliss v. Barnhart, 427 F.3d 1211 (9th Cir. 2005), and Gangelhoff v. Apfel, 2003 WL 22353047 (N. D. Iowa, July 13, 2003)). An ALJ in Social Security hearings "will take administrative notice of reliable job information available from various governmental and other publications." 20 C.F.R. § 404.1566(d); Jordan v Astrue, 2009 WL 3380979 (D. Neb., October 21, 2009).

The regulations provide that the Commissioner will take administrative notice of job data obtained from the Dictionary of Occupational Titles, published by the Department of

---

[10]Daubert v. Merrell Dow Pharmaceuticals, Inc. held that the Federal Rules of Evidence provide the standard for admitting expert scientific testimony in a federal trial.

[11]Kumho Tire Co. Ltd. v. Carmichael held that the Daubert factors may apply to the testimony of engineers and other experts who are not scientists.

24

Labor; County Business Patterns, published by the Bureau of the Census; Census Reports; Occupational Analyses, prepared for the Social Security Administration by various State employment agencies; and Occupational Outlook Handbook, published by the Bureau of Labor Statistics. 20 C.F.R. § 404.1566(d). Various courts have addressed the reliability of job statistics from other sources in the context of vocational expert testimony at Social Security administrative hearings. In <u>Gay v. Sullivan</u>, 986 F.2d 1336, 1340 (10th Cir. 1993), the court held that Employment Statistics Quarterly published by United Stat Publishing Company was a proper source for job number testimony. In <u>Liskowitz v. Astrue</u>, 559 F.3d 736, 743-744 (7th Cir. 2009), the court of appeals noted that the vocational expert's source -- Occupational Employment Quarterly -- "does indeed seem to be a source on which VEs customarily rely."

Plaintiff's substantive argument is the same as that raised in <u>Liskowitz v. Astrue</u>, 559 F.3d 736 (7th Cir. 2009). There the court of appeals stated:

> As to this first argument, it is not entirely true that the VE failed to vindicate the reliability of the data on which she relied. The VE initially admitted that she could not assess the degree of accuracy of the data sources on which she was relying. However, on follow-up questioning, she added that these sources were "widely recognized as acceptable sources in the vocational rehabilitation area." Perhaps ideally the VE would have been able to say a bit more, but this does not go without saying. The witness was testifying as a vocational expert, not as a census taker or statistician. Indeed, even if the VE had happened to know something about the statistical basis for her testimony, she arguably still would not be in a position to fully vindicate her conclusions. After all, statisticians use arithmetic operations, but few probably have studied the foundations of arithmetic in set theory. Is the statistician's use of arithmetic therefore unjustified? Clearly not. In administrative proceedings, no less than in ordinary life, "explanations come to an end somewhere." LUDWIG WITTGENSTEIN, § 1 *PHILOSOPHICAL INVESTIGATIONS* (G.E.M. Anscombe trans., 1968).

<u>Liskowitz v. Astrue</u>, 559 F.3d at 743.

In the case before me, the vocational expert provided testimony about the sources of her information; and she testified about vocational expert training on which sources to use and how to use those sources, which clearly indicates the sources she used are "widely recognized as acceptable."

In his reply, plaintiff points out that his real argument[12] is not so much the substantive issue discussed above but the "procedural due process" argument, i.e., the "ALJ's absolute obligation to rule on post hearing objections to the vocational expert testimony." In his post-hearing memorandum, plaintiff attempts to impeach the vocational expert's testimony by referring to another source of job information, ONET, (http://www.onetonline.org) and his own statistical suggestions -- "If there were an even number of positions across the 1,590 jobs under this SOC code, then .06% of the jobs would be that of small parts assemblers. By Ms. Salva's testimony, there are 477 times jobs [sic] than the average. According to Ms. Salva's testimony, that would leave 70% of the jobs to the remaining 1,589 jobs listed under SOC code 51-9199. The job numbers for the inserting machine operator are similarly incredible. Ms. Salva testified that there are 75,000 nationally, which computes to almost 60% of the 126,000 positions that cover the 14 jobs under the relevant SOC code. This testimony is not credible, is not reliable and cannot be used as the basis to deny benefits in this case." (Tr. at 199).

First, plaintiff's argument relies on application of his own statistics; however, plaintiff provided no authority for a finding that a vocational expert's testimony is not credible unless it comports with the plaintiff's own statistical formula. Further, the vocational expert testified about ONET during voir dire: "You have to look at, you either have to talk to someone in Human Resources or you have to go out and look at the job and then, and then you determine what's the best <u>Dictionary of Occupational Titles</u> that you can go by. Vocational counselors are trained through the education system to use the <u>Dictionary of Occupational Titles</u>, <u>Selected Characteristics of Jobs</u> or the O-NET which is not really widely used but we are trained to use

---

[12]"The issue before this Court cannot concern the *answers* to the relevant and reasonable questions posed by Plaintiff's pre-hearing, at hearing, and post-hearing objections relating to the reliability of the vocational expert's testimony. [A]s Defendant's argument assumes, . . . the ALJ did not rule one way or the other on them and did not present them to the vocational expert." (plaintiff's reply, p. 3).

those things." (Tr. at 41). The vocational expert clearly testified that the source urged by plaintiff as a more reliable source is not actually a widely-used source.

In any event, returning to plaintiff's procedural due process argument, I am left with two findings: (1) the vocational expert's testimony was based on reliable sources, and (2) the ALJ did not explicitly rule plaintiff's objection and make this finding prior to issuing her opinion. Plaintiff urges the court to remand this case:

> [A] supplemental hearing or interrogatory questions to the vocational expert would have likely been sufficient to address this issue, and would not impose an undue burden on the government.
>> That the ability to fully inquire into the basis for a vocational expert's testimony, and the ALJ's failure to make allowance for this inquiry implicates whether a "full and fair hearing" has occurred, [h]as been addressed by the Seventh Circuit in Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir.2002), and McKinnie v. Barnhart, 368 F. 3d 907 (7th Cir. 2004).

(plaintiff's brief, p. 8-9).

I fail to understand plaintiff's suggestion that a supplemental hearing or interrogatory questions to the vocational expert would be helpful. Plaintiff's argument is that the ALJ did not rule an objection, not that some particular testimony was not obtained. Therefore, nothing more is needed from the vocational expert in order to get a ruling on plaintiff's objection to the vocational expert's testimony.

In McKinnie v. Barnhart, 368 F.3d 907 (7th Cir. 2003), cited by plaintiff, the court of appeals reversed the district court's order affirming the denial of disability benefits.

> We have recognized that the standards by which an expert's reliability is measured may be less stringent at an administrative hearing than under the Federal Rules of Evidence. Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002). Nevertheless, because an ALJ's findings must be supported by substantial evidence, an ALJ may depend upon expert testimony only if the testimony is reliable. Id. ("Evidence is not 'substantial' if vital testimony has been conjured out of whole cloth."); see also Consol. Coal Co. v. Stein, 294 F.3d 885, 893 (7th Cir. 2002) (parties to an administrative proceeding must satisfy the ALJ that their experts are qualified). A vocational expert is "free to give a bottom line," but the data and reasoning underlying that bottom line must be "available on demand" if the claimant challenges the foundation of the vocational expert's opinions. Donahue, 279 F.3d at 446. "If the basis of the vocational expert's

27

conclusions is questioned at the hearing . . . then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable." Id.

McKinnie v. Barnhart, 368 F.3d at 910-911 (7th Cir. 2004).

Plaintiff's reliance on this quotation is misplaced. There is no requirement in Social Security administrative hearings that data and reasoning underlying the vocational expert's "bottom line" must be "available on demand," and to the extent McKinnie expressed such a holding, I decline to follow it. McKinnie cited Donahue as authority for that statement. However, the court in Donahue found that where a vocational expert *does* provide the data and reasoning underlying his testimony, then Federal Rule of Evidence 704(a) has been satisfied, and if such a process is good enough to satisfy the Federal Rules of Evidence, then it is good enough to satisfy the requirements of a Social Security administrative hearing. Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002).[13]

A more persuasive case is Brault v. Commissioner of Social Security, 683 F.3d 443 (2nd Cir. 2012). In that case, the plaintiff made the precise argument raised by plaintiff in the case before me:

> But his main objection to the VE's testimony was that it did not reliably match the DOT codes to the OEQ data. According to Brault's submissions to the ALJ, the OEQ does not compile data by DOT code, but rather by Standard Occupational Classification System ("SOC") code, a new system the Bureau of Labor Statistics has embraced to replace the DOT code regime. SOC codes, however, are not useful for disability proceedings because they do not contain the same detailed occupational information as DOT codes. Thus a VE must use some method for associating SOC-based employment numbers to DOT-based job types. The problem, however, is that DOT codes are much more

---

[13]This line of reasoning suggested by plaintiff is not widely followed in other circuits: "[T]here appear to be good reasons to question Donahue's approach. Donahue relied heavily on the principles, if not the actual authority, of Fed.R.Evid. 702 and Daubert, 509 U.S. 579. But Congress has provided, quite clearly, that the Federal Rules of Evidence do not apply in Social Security proceedings. It is unclear, therefore, why the Seventh Circuit would acknowledge in Donahue that ALJs are not bound by the Rules of Evidence, but then turn around and require ALJs to hew so closely to Daubert's principles." Brault v. Commissioner of Social Security, 683 F.3d 443, 449 (2nd Cir. 2012) (citations omitted).

granular than SOC codes -- according to Brault, there were nearly 13,000 job titles in the 1991 edition of the DOT, but only about 1,000 SOC titles.

Citing this inexact matching, Brault submitted a memorandum arguing that "the underlying numbers [are] unscientific and fail to meet the Daubert standard for reliability." According to him, "the numerical data provided by the SOC code do[ ] not enable a vocational expert to accurately determine the number of jobs within that SOC code for a particular DOT title." As such, he maintained that the VE "has no scientific basis to break down between the various DOT titles" and to match them to SOC codes. He then explained -- without any citation -- that an expert "must use a 'crosswalk,'" in other words, a data-matching algorithm, "to cross-reference the occupational detail for a particular DOT code to a SOC code [and then must] use the statistical data to define the number of jobs related to that DOT code."

Brault's counsel addressed most of these points while cross-examining the VE. While acknowledging Brault's objections, however, the VE denied having reported the numbers for the entire SOC. Instead, he claimed to have "reduced" the numbers from "the entire [SOC] code" to only count "jobs . . . that I know exist." With the ALJ's permission, Brault's counsel submitted additional briefing fully setting forth his objections to the VE's SOC-to-DOT mapping methodology.

The ALJ never directly responded to those objections. Instead, about a month after the hearing, the ALJ issued a ruling which relied on the VE's testimony, agreed that positions existed in the eight DOT positions the VE had identified at the numbers the VE had given, and denied Brault's application for benefits.

Brault appealed to the district court, which rejected Brault's challenge to the reliability of the VE's testimony, noting that it was appropriate for the VE to consult the OEQ in rendering his testimony. It affirmed the Commissioner's decision as supported by substantial evidence. Brault timely appeals. . . . Brault argues the ALJ erred by relying on VE testimony which Brault considers of dubious reliability. According to Brault, once that testimony had been challenged, the ALJ was *required:* (1) to grant an opportunity to inspect and challenge the proffered evidence and (2) if the ALJ relied on the challenged evidence, to explain why the challenge was rejected. Brault claims to find support in Seventh Circuit case law, but he candidly acknowledges a split among our sister circuits on the matter -- one we have yet to address. Compare Bayliss v. Barnhart, 427 F.3d 1211 (9th Cir. 2005) with McKinnie v. Barnhart, 368 F.3d 907 (7th Cir. 2004). . . .

There is no question that the ALJ, in his written ruling, did not mention Brault's objection to the VE's testimony. In accepting that testimony, the ALJ necessarily rejected Brault's grievances, but Brault argues this implied rejection was insufficient -- the ALJ needed to do more. In his view, he was owed an explanation.

He claims support from Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002), purporting to quote from what he characterizes as the Seventh Circuit's holding that, when an expert's conclusions have been challenged, ALJs must "make an inquiry" and "explain how any conflict that has been indentified [sic] was resolved." This is a

misquotation and mischaracterization of the Seventh Circuit's language. The actual unaltered quotation is from a Social Security ruling that the court is discussing in its opinion -- a ruling it cited only by way of analogy. See Donahue, 279 F.3d at 446. Nor do McKinnie, 368 F.3d at 911, and Lawrence v. Astrue, 337 Fed.Appx. 579, 585 (7th Cir. 2009) (unpublished), which Brault also cites, support his argument.

This outcome, of course, is no surprise. An ALJ does not have to state on the record every reason justifying a decision. "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). "An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." Id. (citation omitted). . . . Assuming the ALJ had to consider Brault's objection to the VE's testimony, we are satisfied that he did so. There is no requirement that the ALJ discuss his specific analysis of it.

Brault v. Commissioner of Social Security, 683 F.3d at 446-448.

I find Brault persuasive and therefore adopt its reasoning. The issue raised by plaintiff here was raised before the ALJ, plaintiff's attorney had an opportunity to voir dire the expert witness at the administrative hearing, he was able to cross examine the vocational expert during the hearing, no objection was raised during the hearing, plaintiff's counsel acknowledged in a post-hearing memorandum that the ALJ had already overruled the objection, and plaintiff's attorney renewed the objection in that post-hearing brief. The ALJ thereafter issued her opinion relying on the testimony of the vocational expert. There can be no other conclusion but that the ALJ considered the plaintiff's challenge and rejected it. The fact that such an obvious conclusion was not put in writing in the ALJ's opinion, when the law in this circuit does not require that the ALJ discuss every piece of evidence submitted, is not a reasonable ground for remand.

## VII.    SIT-STAND OPTION

Plaintiff argues that the ALJ erred in finding that plaintiff needs a sit-stand option, but failing to specify at what intervals plaintiff must sit and stand. "[T]he ALJ's failure to adhere to

the requirements of SSRs 96-9p[14] and 83-12[15] that the sit/stand option explicitly state the frequency of the claimant's need to alternate between sitting and standing makes meaningful judicial review impossible. Meaningful review is impossible because although the vocational expert identified jobs in response to a *generic* sit/stand option requirement, none of the vocational expert's testimony considered the specific limitations required pursuant to these Rulings. In short, the vocational expert's testimony may be entirely different if the claimant

---

[14]"Alternate sitting and standing: An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work." Titles II & XVI: Determining Capability to Do Other Work - Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work, SSR 96-9P (S.S.A. July 2, 1996).

[15]"Alternate Sitting and Standing. In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.) There are some jobs in the national economy--typically professional and managerial ones--in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base." Titles II & XVI: Capability to Do Other Work - The Medical-Vocational Rules As A Framework for Evaluating Exertional Limitations Within A Range of Work or Between Ranges of Work, SSR 83-12 (S.S.A. 1983).

needs to shift positions constantly on and off throughout the day, versus occasionally."
(plaintiff's brief, page 13). Plaintiff then suggests that he is truly limited to sedentary work
which requires a finding of "disabled" upon plaintiff's 50th birthday in 2013 (plaintiff's brief,
p. 13-14).

The ALJ included an at-will sit-or-stand option in the hypothetical question to the
vocational expert and in the residual functional capacity assessment. At-will sit-stand options
are proper. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) ("The hypothetical here
addressed Davis' need to sit and stand at will, and required the expert to limit her
consideration to jobs which would 'allow for alternate sitting and standing.' In response to a
specific question from the ALJ, the expert indicated that [certain positions] would permit Davis
to sit *and* stand at will, and the vocational expert took this need into account in assessing the
jobs Davis was capable of performing. The hypothetical was sufficient").

Here the ALJ's hypothetical involved a person who would need to have the option to sit
or stand, and the vocational expert testified that the positions she identified could be performed
sitting or standing (Tr. at 44).

Plaintiff cites SSR 96-9p as support for his position that the ALJ must specify the sit-
stand intervals which is "not a mere technicality." Contrary to plaintiff's assertion, SSR 96-9p
deals with situations in which an individual is limited to less than the full range of sedentary
work, and it suggests consulting a vocational resource for guidance when an individual needs
to alternate the sitting required of sedentary work with standing or walking. Plaintiff also cites
SSR 83-12 in support of his argument; however, that ruling discusses the use of the
medical-vocational guidelines as a framework for evaluating exertional limitations between
ranges of work, and again suggests consulting a vocational specialist in special situations such
as when a claimant needs to alternate sitting and standing. Finally, plaintiff cites Peterson v.

_Chater_, 96 F.3d 1015, 1016 (7th Cir. 1996), apparently for the proposition that unless sit-stand options are "properly crafted" by the ALJ, a remand to the agency for new findings is required. This case is easily distinguishable -- in _Peterson_, the ALJ found that Peterson was not capable of working in a job that requires prolonged sitting, standing, and walking and needed to alternate sitting and standing every hour, but failed to consult a vocational expert, vocational dictionary, or other appropriate guide or source to determine whether there are sufficient jobs in the national economy that Peterson could perform. _Id_. at 1016. The major differences between _Peterson_ and the case before me are that the ALJ in _Peterson_ did specify the sit-stand intervals and did not obtain vocational expert testimony, whereas in the case before me the ALJ assessed an at-will sit-stand option and did obtain vocational expert testimony.

A more appropriate case is _Carlson v. Chater_, 74 F.3d 869 (8th Cir. 1996), in which the plaintiff argued that the ALJ ignored SSR 83-12 by finding that Carlson could perform unskilled jobs with a sit-stand option. The court of appeals disagreed, pointing out that Carlson's reading of SSR 83-12 was erroneous in that SSR 83-12 simply states that a vocational expert should be consulted in cases where a sit-stand option is required. _Carlson v. Chater_, 74 F.3d at 871.

Here, the ALJ assessed a sit-stand option at will, which is proper in the Eighth Circuit, and obtained the testimony of a vocational expert in order to determine how the appropriate job base would be eroded by that requirement. No error was committed.

## XI.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

33

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 19, 2016